IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| TYRONE CAMERON, | ) | Case No. 4:23-cv-00280-SMR-HCA |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | ORDER ON DEFENDANTS' MOTION |
| CITY OF DES MOINES, DANA | ) | FOR SUMMARY JUDGMENT |
| WINGERT, individually and in his official | ) | |
| capacity, DAOBANDON MEUNSAVENG, | ) | |
| individually and in his official capacity, | ) | |
| JASON HAYS, individually and in his | ) | |
| official capacity, MITCHELL LEE, | ) | |
| individually and in his official capacity, | ) | |
| RYAN ARMSTRONG, individually and in | ) | |
| his official capacity, BEN CARTER, | ) | |
| individually and in his official capacity, and | ) | |
| JASON HALIFAX, individually and in his | ) | |
| official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff Tyrone Cameron leapt from a second floor rooftop in an attempt to evade arrest on suspicion of first degree murder. One of the officers pursuing him released a K-9 who performed a bite and hold maneuver to halt Cameron's flight from authorities. He later filed this lawsuit alleging that his arrest violated the Fourth Amendment's prohibition against unreasonable seizures. Cameron argues that the United States Constitution obligates law enforcement to provide a warning before deploying a K-9 to apprehend a fleeing murder suspect. He also claims that the dog bite lasted so long that it contributed to the unconstitutional use of force. Cameron named as Defendants the City of Des Moines ("City"), Des Moines Chief of Police Dana Wingert, and the six individual officers who participated in his arrest. Those Defendants now seek summary judgment on his claims.

1

## I.   BACKGROUND

### A.  Factual Background[1]

On April 8, 2022, Cameron was the subject of an arrest warrant for first degree murder stemming from a shooting five days earlier.  [ECF No. 29-1 ¶ 11].  He was also wanted on other outstanding arrest warrants and has a violent criminal history.  *Id*.  Law enforcement officers considered him as armed and dangerous as they embarked to execute the arrest warrant.  *Id*. ¶ 12. Officers believed that Cameron could be located at a residence on Urbandale Avenue in Des Moines, Iowa.  *Id*. ¶ 13.  The residence was associated with a woman who was the protected party in a no-contact order issued against Cameron.  *Id*.

Multiple Des Moines police officers, including K-9 Officer Daobandon Meunsaveng and his police dog, Bero, were dispatched to the residence.  *Id*. ¶ 14.  Upon arrival, the officers were allowed entry after knocking on the door of the two-floor duplex.  *Id*. ¶ 15.  While standing at the base of the stairs with the other officers, Officer Ben Carter called out for Cameron to identify himself and his location.  *Id*.  He also announced that a police dog was present and would bite if Cameron did not surrender.  *Id*.  The occupant of the residence directed the officers to the second floor, where Cameron was hiding.  *Id*. ¶ 16.

As the officers climbed the stairs, Cameron was spotted on the roof of the residence in an apparent attempt to flee.  *Id*. ¶ 19.  At this point, Officer Carter and Officer Jason Hays pursued Cameron.  *Id*. ¶¶ 20–22.  Simultaneously, Officer Meunsaveng and Officer Mitchell Lee moved to positions outside the building to prevent Cameron from escaping.  *Id*. ¶ 21.  While they positioned

---

[1] This factual recitation is drawn from the summary judgment record submitted by the parties.  The Court views the facts in the light most favorable to Cameron, giving him the benefit of all reasonable inferences that can be drawn from the record.  *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).

themselves, Cameron leapt from the second floor rooftop in an effort to evade the officers. *Id.* ¶ 25. After landing on the ground, Cameron attempted to flee on foot but stumbled and fell. *Id.* ¶ 28.

At this point, Officer Meunsaveng released Bero with a command to bite and hold Cameron. *Id.* ¶¶ 29–30. The dog quickly reached Cameron, who was getting back on his feet, and bit him on the side. *Id.* ¶ 32. Officer Hays's body camera footage shows Bero making contact with Cameron within seconds of his fall. *Id.* As Bero subdued Cameron, Officer Lee moved in to handcuff him. *Id.* ¶ 34. Officer Meunsaveng commanded Cameron to place his hands in a visible position in order to handcuff him. *Id.* ¶ 33. Bero was removed from Cameron within 15 seconds of the initial bite. *Id.* ¶¶ 35–36.

Immediately following his arrest, Cameron complained of pain in his arm and leg, injuries he attributed to jumping from the roof. *Id.* ¶ 37. He did not specifically report any pain from the dog bite. The officers on the scene called for medical assistance. Body camera footage shows Cameron telling the officers that he believed he broke his leg during his fall. *Id.* ¶¶ 37–38.

Cameron was later charged with multiple crimes, including first-degree murder, in connection with the events leading to his arrest. [ECF No. 29-2 at 201]. On August 12, 2022, following a jury trial, Cameron was acquitted of all charges related to the murder and several other violent crimes, including attempted murder and willful injury. *Id.* at 208–14. He was subsequently charged with felon in possession of ammunition in the United States District Court for the Southern District of Iowa. *See United States v. Cameron*, No. 4:22-cr-00157-SMR-HCA-1, ECF No. 4 (S.D. Iowa Oct. 18, 2022). Cameron was convicted on this charge and sentenced to 120 months' imprisonment. *Cameron*, No. 4:22-cr-00157, ECF No. 97. His conviction was affirmed on appeal

by the United States Court of Appeals for the Eighth Circuit. *United States v. Cameron*, 99 F.4th 432, 437 (8th Cir. 2024).

### B. Procedural Background

Cameron brings ten claims in total against Defendants.  He alleges that Officer Meunsaveng effected an unreasonable seizure under the Fourth Amendment by using excessive force in his utilization of Bero.  Count II asserts a claim against Officer Hays, Officer Lee, Officer Armstrong, Officer Carter, and Officer Halifax.  Cameron argues that those officers violated his constitutional rights by failing to intervene in Officer Meunsaveng's use of excessive force.  In Count III, he contends that the City and Chief Dana Wingert are liable for failing to train or supervise their employees regarding the constitutional use of force with K-9 officers.  Count IV is a constitutional claim against the City and Chief Wingert on the grounds that they established inadequate and insufficient policies or customs in the use of K-9 officers to apprehend suspects. Count V through Count X are all state law claims against various Defendants.  Count V alleges negligence against all of the officers present at the scene of Cameron's arrest.  Count VI accuses Officer Meunsaveng of battery and Count VII alleges that the other five officers aided and abetted the battery.  Count VIII brings a claim for statutory liability against the City for a dog bite pursuant to Iowa Code § 351.28.  Count IX and Count X assert common law claims against the City and Chief Wingert for negligent hiring, training, and supervision, along with a claim for *respondeat superior* liability for their employee's tortious conduct.

Defendants move for summary judgment on all counts.  They contend that Officer Meunsaveng did not use excessive force when he arrested Cameron, so they are entitled to summary judgment on the Fourth Amendment claim against him and all of the derivative constitutional claims against the remaining officers and the City.  Defendants argue that the state

law claims fail for the same reasons.  Specifically, they contend there was nothing excessive about the use of force by Officer Meunsaveng, so Cameron cannot establish a negligence or battery claim.  Defendants argue that, at a minimum, they are immune from liability under both federal and state law.

Cameron resists Defendants' Motion for Summary Judgment.  He argues that Officer Meunsaveng used excessive force and the other officers on the scene failed to intervene in that constitutional violation.  Cameron urges that his right to be free from excessive force was clearly established by law, so qualified immunity is inapplicable.  He argues that the City and Chief Wingert are liable for their own constitutional violations for failing to properly train and supervise their employees on constitutional use of force.  Cameron further contends that summary judgment is improper on his state law claims in light of the excessive use of force by Officer Meunsaveng.

## II.   DISCUSSION

### A.  *Legal Standards*

#### 1.  Motion for Summary Judgment

Summary judgment is proper when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  *Meyer v. McKenzie Elec. Coop., Inc.*, 947 F.3d 506, 508 (8th Cir. 2020) (citing Fed. R. Civ. P. 56(a)).  A material fact is one that "may affect the outcome of the lawsuit."  *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir. 2016) (citation omitted).  A dispute over a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

At summary judgment, the nonmoving party is entitled to the benefit of all reasonable inferences that may be drawn from a record viewed in the light most favorable to it.  *McGowen,*

*Hurst, Clark & Smith, P.C. v. Com. Bank*, 11 F.4th 702, 710 (8th Cir. 2021) (citing *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc)).  The reasonable inference to which a nonmovant is entitled is significantly limited when a party's version of events "is blatantly contradicted by the record, so that no reasonable jury could believe it."  *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Bernini v. City of St. Paul*, 665 F.3d 997, 1003–04 (8th Cir. 2012) (noting that it is permissible for a court to view the facts on summary judgment "in the light depicted by a videotape that capture[s] the events in question").

2.   Section 1983

Cameron alleges that Defendants violated his Fourth Amendment right to be free from unreasonable seizures.  He brings his federal constitutional claims pursuant to Section 1983, which creates a federal remedy against anyone who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.  The United States Supreme Court has explained that the statute "creates a species of tort liability." *Heck v. Humphrey*, 512 U.S. 477, 483 (1994) (citation omitted).  Section 1983 does not create substantive rights but "merely provides a mechanism for enforcing individual rights 'secured' elsewhere." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002).

To prevail on his Section 1983 claim, Cameron must show: (1) Defendants acted under color of state law and (2) the allegedly unlawful conduct deprived him of a federal right protected by the United States Constitution or federal law.  *Roberson v. Dakota Boys & Girls Ranch*, 42 F.4th 924, 928 (8th Cir. 2022) (quoting *Zutz v. Nelson*, 601 F.3d 842, 848 (8th Cir. 2010)).

Under Section 1983, government officials are liable only for their own misconduct.  *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015) (citation omitted).  Accordingly, "a plaintiff must show each individual defendant's personal involvement in the alleged violation."  *White v.*

*Jackson*, 865 F.3d 1064, 1080–81 (8th Cir. 2017); *see also Smith v. City of Minneapolis*, 754 F.3d 541, 547 (8th Cir. 2014) (observing "Section 1983 does not sanction tort by association.") (cleaned up) (citation omitted).

### 3.  Qualified Immunity

The Supreme Court has repeatedly held that government officials are entitled to qualified immunity from civil liability under Section 1983 when their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (citation omitted).  Qualified immunity is not "a mere defense to liability" for the government official, but immunity from suit.  *Pearson v. Callahan*, 555 U.S. 223, 237 (2009) (citation omitted).  Unlike individual government officials, municipalities may not invoke qualified immunity.  *Thurmond v. Andrews*, 972 F.3d 1007, 1013 (8th Cir. 2020) (citation omitted).

To overcome a qualified immunity defense, a plaintiff must show the violation of a statutory or constitutional right that was clearly established at the time of the alleged violation. *Smith v. City of Minneapolis*, 754 F.3d 541, 545 (8th Cir. 2014) (citation omitted).  The Supreme Court has emphasized that "the doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (cleaned up) (citation omitted).

The purpose of qualified immunity is to give "ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law."  *Hunter v. Bryant,* 502 U.S. 224, 229 (1991) (citation omitted).  "Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns

on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Anderson v. Creighton,* 483 U.S. 635, 639 (1987) (cleaned up) (citation omitted).

The qualified immunity analysis consists of a two-prong analysis: (1) whether the plaintiff has stated a plausible claim for violation of a constitutional or statutory right, and (2) whether the right was clearly established at the time of the alleged deprivation. *Kulkay v. Roy*, 847 F.3d 637, 642 (8th Cir. 2017) (citation omitted). The Supreme Court has concluded that a court may determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. A plaintiff must establish both of the elements, otherwise qualified immunity must be granted. *See McCaster v. Clausen*, 684 F.3d 740, 746 (8th Cir. 2012) (holding "defendants are entitled to qualified immunity unless the answer to both of these questions is yes") (citing *Krout v. Goemmer,* 583 F.3d 557, 564 (8th Cir. 2009)). Therefore, the qualified immunity analysis ends if a plaintiff fails to establish one of the prongs.

Whether a government official's conduct violated clearly established law is "essentially [a] legal question." *Crawford-El v. Britton*, 523 U.S. 574, 589 (1998) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526–29 (1985)). "The plaintiff has the burden of demonstrating that the law confirming [his] constitutional right was clearly established." *Hanson v. Best*, 915 F.3d 543, 548 (8th Cir. 2019) (citation omitted). A clearly established right is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Cent. Specialties, Inc. v. Large*, 18 F.4th 989, 997 (8th Cir. 2021) (citation omitted).

Clearly established law should not be defined "at a high level generality" but "must be 'particularized' to the facts of the case." *White v. Pauly*, 580 U.S. 73, 79 (2017) (citations omitted);

*Mullenix*, 577 U.S. at 12 (emphasizing that the inquiry into whether a right is clearly established, "must be undertaken in light of the specific context of the case, not as a broad general proposition").  Accordingly, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (citation omitted).

A plaintiff seeking to overcome a defendant's assertion of qualified immunity need not identify "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  Even without binding authority, "a robust consensus of cases of persuasive authority" can demonstrate that the law was clearly established. *De La Rosa v. White*, 852 F.3d 740, 746 (8th Cir. 2017) (citation omitted).

The Eighth Circuit has summarized the three ways a plaintiff can demonstrate clearly established law: (1) identify binding precedent with similar facts that "squarely governs the situation;" (2) point to "a robust consensus of cases of persuasive authority" but "a consensus based on the decision of a single circuit and a handful of lower courts" is not robust; or (3) "in rare instances" a general constitutional rule may apply with "'obvious clarity.'" *Hovick v. Patterson*, 37 F.4th 511, 517 (8th Cir. 2022) (cleaned up) (citations omitted).

## B.  Analysis

### 1.  Count I: Excessive Force

#### a.  Legal Standard

Excessive force claims arising out of an arrest must be analyzed under the reasonableness standards of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Wilson v.*

*Lamp*, 901 F.3d 981, 989 (8th Cir. 2018) ("The Fourth Amendment protects citizens from being seized through excessive force by law enforcement officers.") (quoting *Mettler v. Whitledge*, 165 F.3d 1197, 1202 (8th Cir. 1999)).  If the use of force is "objectively reasonable" it is not unconstitutionally excessive and it does not violate the Fourth Amendment.  *Drew v. City of Des Moines*, 111 F.4th 881, 883 (8th Cir. 2024).

Whether the use of force is "objectively reasonable" is assessed according to the "totality of the circumstances."  *Cole ex. rel. Est. of Richards v. Hutchins*, 959 F.3d 1127, 1132 (8th Cir. 2020) (citations omitted).  Considerations regarding the reasonableness of the force applied requires a balance between the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Graham*, 490 U.S. at 396.  A proper balance of these interests "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.*

The totality of the circumstances must be judged from the perspective of a reasonable officer on the scene—not with the benefit of 20/20 hindsight.  *Carpenter v. Gage*, 686 F.3d 644, 649 (8th Cir. 2012) (citation omitted).  Whether force is excessive under the Fourth Amendment is a question of law.  *Brossart v. Janke*, 859 F.3d 616, 624 (8th Cir. 2017) (citing *Davis v. White*, 794 F.3d 1008, 1013 (8th Cir. 2015)).

b.  Analysis

Defendants argue that they are entitled to summary judgment on Cameron's excessive force claim because the use of Bero was reasonable under the circumstances.  There are two primary issues to resolve in determining whether there was an unreasonable seizure in this case.

The first is whether Officer Meunsaveng was constitutionally-obligated to provide a warning to Cameron before deploying Bero.  The second question is whether Bero was allowed to bite Cameron for an unreasonably long period of time.

i.   Warning

Cameron argues that he did not receive a warning about the use of a police dog at any point during the events preceding the release of Bero.  He maintains that Officer Meunsaveng did not give him a verbal warning immediately prior to releasing Bero.  Cameron denies any implication that the statement made by an officer in the duplex regarding the use of the dog was a constitutionally sufficient warning.  He also insists there is no evidence in the summary judgment record that he personally heard the warning.  *See* [ECF No. 45 at 4] (suggesting "[t]here is no reason to believe Tyrone heard this statement, as he was suspected of being on the second floor of the building, and was seen on the roof seconds later").

The Eighth Circuit has previously held that a warning is ordinarily required before law enforcement releases a K-9 to apprehend a suspect.  *See Kuha v. City of Minnetonka*, 365 F.3d 590, 598 (8th Cir. 2003), *abrogated in part on other grounds by Szabla v. City of Brooklyn Park, Minn.*, 486 F.3d 385, 397 (8th Cir. 2007) (en banc).  In *Kuha*, the Eighth Circuit recognized that "a jury could properly find it objectively unreasonable to use a police dog trained in the bite and hold method without first giving the suspect a warning and opportunity for peaceful surrender." *Id*.  Accordingly, "the presence or absence of a warning is a critical fact in virtually every excessive force case involving a police dog."  *Id*. at 599.  This is not a *per se* rule, however, as the Eighth Circuit has recognized that there may be "'exception cases' where a warning need not be given." *Adams v. City of Cedar Rapids*, 74 F.4th 935, 940 (8th Cir. 2023); *see also Szabla*, 486 F.3d at 397

("Under our precedent, [a warning] is a generally required safeguard, which may be dispensed with only if there are exigent circumstances.") (Gibson, J., dissenting).

Defendants contend that they are entitled to qualified immunity on the excessive force claim because it was not clearly established at the time of the arrest that the manner in which Bero was used violated the Fourth Amendment. They concede that the Eighth Circuit generally requires a warning before use of a K-9, but reject that it is a blanket constitutional requirement. Defendants emphasize that the case law on this issue involves significantly different factual circumstances from those here.

Cameron responds that his right to be free from excessive force was clearly established at the time he was arrested. He insists that *Kuha*, *Szabla*, and *Adams* all establish that a failure to warn before releasing a K-9 constitutes excessive force. Cameron rejects the notion that any exceptional circumstances existed in this case.[2]

In order to demonstrate that a right was clearly established, a plaintiff "must identify controlling authority" that places a constitutional question "beyond debate." *Morgan v. Robinson*, 920 F.3d 521, 527 (8th Cir. 2019). The Supreme Court has deemed it essential that "clearly established law" must be "'particularized' to the facts of the case." *al-Kidd*, 563 U.S. at 742 ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality."); *see also Pauly*, 580 U.S. at 79 ("Today, it is again necessary to reiterate the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'"). The high court has repeatedly "stressed that the 'specificity' of the [clearly established law] rule is

---

[2] In addition to asserting his right to a warning before Bero was released, Cameron lodges a broadside attack against the qualified immunity doctrine flatly stating that it "should not continue." [ECF No. 45 at 12]. He offers an extensive critique on the ahistorical and impractical basis for the doctrine before declaring "[q]ualified immunity must be overturned." *Id*. at 14.

'especially important in the Fourth Amendment context.'" *Dist. of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quoting *Mullenix*, 577 U.S. at 12); *see also Kisela v. Hughes*, 584 U.S. 100, 104 (2018) ("Use of force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue.") (citation omitted).

Cameron has not met his burden to overcome Defendants' qualified immunity defense regarding a warning before releasing a K-9. First, as the Court has noted and both parties acknowledge, the warning requirement is not a bright line rule within the Eighth Circuit. *See Grady v. Becker*, 907 F. Supp. 2d 975, 982 (D. Minn. 2012) (explaining that "*Kuha* held that the absence of a warning does not violate the Fourth Amendment *per se*, but rather is a 'critical fact' in the excessive-force analysis"). The Eighth Circuit has expressly recognized that certain situations may present circumstances where a warning is not constitutionally required. *See Kuha*, 365 F.3d at 599–600. Furthermore, the fact patterns presented in the trio of cases identified by Cameron do not "squarely govern" the situation here.

In *Kuha*, the suspect had fled on foot from a routine traffic stop after he failed to dim his headlights for an oncoming police car. *Kuha*, 365 F.3d at 595. The man entered a swamp where the officer was unable to locate him. A responding K-9 officer brought his partner to assist in the search, but the dog was also trained in the "bite and hold" method. *Id*. During the search, the K-9 located the man in three-foot high grass and bit him in the upper leg. *Id*. The *Kuha* court remarked that the case concerned an "odd turn of events." *Id*. at 600.

*Szabla* also entailed particularly strange facts. In that case, an officer had discovered a wrecked automobile with no driver present. *Szabla*, 486 F.3d at 388. The responding officers were unable to locate a driver so they summoned a K-9 officer to assist. The K-9 officer and the

dog arrived and commenced a search for the former occupant of the automobile, unsure if "they were looking for a criminal suspect or an innocent injured person." *Id*. As the K-9 was tracking the scent retrieved from the automobile, he entered a shelter in a city park and bit a man who was sleeping. *Id*. It was later determined that the sleeping man had no involvement with the automobile.

In *Adams*, officers were searching for a vehicle that was suspected to have been involved in a burglary of a convenience store. *Adams*, 74 F.4th at 937. The vehicle was found parked within one mile of the store but, as officers approached it, it sped away. *Id*. After the vehicle crashed into a tree following a police pursuit, five passengers fled on foot. *Id*. Multiple officers conducted a search where one suspect was eventually discovered hiding beneath a metal trailer in a backyard. *Id*. at 938. The K-9 bit the arm of the hiding suspect. *Id*.

In those three cases, officers failed to warn the suspect prior to permitting the K-9 to bite and hold. The Eighth Circuit held in each case that the Fourth Amendment required a warning be provided under those facts. The facts in those cases were materially different than the undisputed facts here. Whereas Cameron was actively fleeing arrest on a first degree murder charge, the other cases did not entail active flight by the suspect and did not involve murder charges.

In *Szabla* and *Adams*, neither of the suspects were actively fleeing arrest. The man in *Szabla* was not a criminal suspect at all, but was merely sleeping in a park shelter. *Szabla*, 486 F.3d at 388. In *Adams*, the suspect had already fled, but was hiding beneath a trailer at the time he was bitten. *Adams*, 74 F.4th at 937. The suspect in *Kuha* was fleeing at the time of the dog bite, but he had fled a routine traffic stop—not an arrest warrant for first degree murder. *Kuha*, 365 F.3d at 595–96. The Eighth Circuit panel in *Kuha* opined that, in most instances, a warning requirement

"would likely diminish the risk of confrontation by increasing the likelihood that a suspect will surrender." *Id.* at 599.  The goal of surrender identified in *Kuha* was unlikely in this case.

First, Cameron was wanted for first degree murder which is a Class A felony in Iowa.  *See* Iowa Code § 707.2(2).  Iowa law imposes a mandatory life sentence without the possibility of parole for a Class A felony conviction.  *Id*. § 902.1(1).  Furthermore, Cameron had already demonstrated a strong disinclination to surrender to officers after he jumped off a second-story rooftop in an effort to flee.

Cameron argues that although he was "suspected" of being armed at the time the arrest warrant was executed, "it was clear he was not [armed] before K9 Bero was released."  [ECF No. 45 at 5].  The fact that there were no weapons "visibly in Tyrone's possession" did not make it clear at the time that he was unarmed.  [ECF No. 41-2 ¶ 18].  Cameron also suggests that it was not reasonable for officers to suspect he was armed at the outset because the firearm homicide for which he was sought had occurred five days earlier.  [ECF No. 45 at 6].

The Supreme Court has mandated that, in the context of an excessive force claim, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.  To that point, courts "must not make immunity conditional on . . . pursuing the most prudent course of conduct as judged by 20/20 hindsight vision." *Thompson v. Dill*, 930 F.3d 1008, 1013 (8th Cir. 2019) (cleaned up) (quoting *Est. of Morgan v. Cook*, 686 F.3d 494, 497 (8th Cir. 2012)).  The Court concludes that it was not clearly established at the time of Cameron's arrest that the Fourth Amendment requires an officer to provide a verbal warning about the deployment

of a K-9 to a fleeing murder suspect.  The Eighth Circuit case law discussed above is clearly and materially distinguishable.

### ii.   Length of Bite

The second component of Cameron's excessive force claim is the length of time that Bero bit him.  The summary judgment record reflects that the bite lasted approximately 15 seconds. [ECF No. 29-1 ¶ 36].  After Bero caught Cameron, Officer Meunsaveng and Officer Lee arrived within seconds.  *Id*. ¶ 33.  They directed Cameron to show his hands to allow him to be restrained. Cameron was handcuffed after about ten seconds and Bero was released within two seconds.  *Id*. ¶ 34.

Cameron points to three factors which he contends support a finding that the bite was constitutionally excessive.  First, he claims that he stopped resisting after Bero bit him.  Next, he asserts that his hands were visible, so officers knew he did not possess a weapon.  Finally, he maintains that there was no need for Bero to continue biting him because he was "immediately surrounded by heavily armed officers."  [ECF No. 45 at 7].  Accordingly, he contends that the force used on him through Bero was unconstitutionally excessive.

Cameron cites to no binding authority or robust consensus of cases within the Eighth Circuit that clearly establish the law regarding unconstitutionally-long dog bites.  *Hovick v. Patterson*, 37 F.4th 511, 517 (8th Cir. 2022) (identifying the ways a plaintiff can show clearly established law for qualified immunity purposes).  The cases he relies upon are three out-of-Circuit cases with distinguishable fact patterns—the totality of which are insufficient to clearly establish a constitutional violation.  *See Becker v. Elfreich*, 821 F.3d 920 (7th Cir. 2016); *Cooper v. Brown*, 844 F.3d 517 (5th Cir. 2016); *Watkins v. City of Oakland*, 145 F.3d 1087 (9th Cir. 1998).

-16-

The United States Court of Appeals for the Seventh Circuit held that it was constitutionally excessive force when an officer allowed a K-9 to bite and hold a non-resistant suspect "for up to three minutes." *Becker*, 821 F.3d 929 n.2. The panel explained that the case did "not involve a split-second delay" in releasing the bite. *Id*. At no point in *Becker* did the suspect attempt to flee, but was instead attacked by the dog as he descended the stairs at his mother's house during the execution of an arrest warrant for him. *Id*. at 924.

In *Cooper*, officers allowed a K-9 to bite a misdemeanor DUI suspect for one to two minutes. *Cooper*, 844 F.3d at 521. The United States Court of Appeals for the Fifth Circuit noted that the suspect was "not actively resisting arrest or attempting to flee or to strike" the K-9. *Id*. at 523. The suspect suffered severe injuries as a result of the K-9 attack, necessitating multiple surgeries which included reconstruction and skin grafts. *Id*. at 521.

The decision by the United States Court of Appeals for the Ninth Circuit in *Watkins* is also distinguishable from the facts here. In that case, police officers responded to a silent burglar alarm at a commercial warehouse. *Watkins*, 145 F.3d at 1090. After observing an individual running through the building, officers deployed a K-9 to apprehend the person. *Id*. The dog subsequently located and bit the suspect. *Id*. The dog maintained the bite for approximately 30 seconds until the suspect complied with an officer's order to show his hands. *Id*. The panel concluded this was constitutionally excessive force and that it was "clearly established that excessive duration of the bite and improper encouragement of a continuation of the attack by officers could constitute excessive force that would be a constitutional violation." *Id*. at 1093.

Use of force on a burglary suspect is materially different than its use on a murder suspect. *Watkins*, along with *Becker* and *Cooper*, do little to demonstrate a robust consensus of case law. *See Z.J. by and through Jones v. Kansas City Bd. of Police Comm'rs*, 931 F.3d 672, 684 n.5 (8th

Cir. 2019) (noting a plaintiff can show a right is clearly established by "pointing to 'a consensus of cases of persuasive authority'—including cases from other jurisdictions") (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).  The Eighth Circuit and other Circuits have regularly found that a "robust consensus of persuasive authority" is not established by a handful of cases.  *See, e.g., L.G. through M.G. v. Columbia Pub. Schs.*, 990 F.3d 1145, 1149–50 (8th Cir. 2021) (finding that precedent from one circuit and "additional cases from federal district courts and state intermediate appellate courts" were insufficient to establish a robust consensus); *Lane v. Nading*, 927 F.3d 1018, 1023 (8th Cir. 2019) (concluding that "the decision of a single circuit and a handful of lower courts" was not a "robust" consensus); *Jacobson v. McCormick*, 763 F.3d 914, 918 (8th Cir. 2014) (holding that "two decisions from other circuits" was insufficient to place an "issue beyond debate"); *see also Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 722 (3d Cir. 2018) (rejecting a decision by a single Circuit as "clearly establish[ing] a right in the absence of controlling precedent"); *McClendon v. City of Columbia*, 305 F.3d 314, 329–33 (5th Cir. 2002) (en banc) (holding that the recognition of the state-created danger doctrine by six Courts of Appeals was "insufficient to clearly establish the unlawfulness of [the officer's] actions")

Aside from their distinct fact patterns, the holdings in *Becker*, *Cooper*, and *Watkins* do little to illustrate a robust consensus in light of other authority where dog bites of longer duration were found to be constitutional.

In *Kuha*, the Eighth Circuit found that a dog bite lasting 10 to 15 seconds was not excessive force because the arresting officers were securing the suspect and searching him for weapons. *Kuha*, 365 F.3d at 601.  In another case, an Eighth Circuit panel concluded it was not excessive force to use a K-9 for 15 seconds when the suspect was "in a paranoid, belligerent, drug-crazed state." *Mann v. Yarnell*, 497 F.3d 822, 826 (8th Cir. 2007).  Other courts have found much longer

dog bites to be objectively reasonable under certain circumstances.  *See McKinney v. City of Middletown*, 49 F.4th 730, 743–44 (2d Cir. 2022) (finding no Fourth Amendment violation when a dog was permitted to bite a suspect for two minutes and fifteen seconds "in the face of active resistance" by the suspect); *Escobar v. Montee*, 895 F.3d 387, 394 (5th Cir. 2018) (allowing police dog to continue biting arrestee for approximately one minute until he was fully handcuffed was objectively reasonable); *Recca v. Pignotti*, 456 F. Supp. 3d 1154, 1169 (D. Neb. 2020) (finding no case law pronouncing it a Fourth Amendment violation for a police dog biting "a noncompliant, actively resisting suspect for 15–30 seconds"); *Gannon v. Medina Twp.*, Case No. 1:21cv601, 2022 WL 3028095, at * 13 (N.D. Ohio Aug. 1, 2022) (concluding there was no authority that "allowing a bite hold to continue for approximately twenty seconds" was a constitutional violation).  Even where the officer "could have called the dog off a second or two sooner . . . that kind of fine-sliced judgment call amid 'tense, uncertain, and rapidly evolving' circumstances just isn't the stuff of a Fourth Amendment violation."  *Ashford v. Raby*, 951 F.3d 798, 804 (6th Cir. 2020) (quoting *Graham*, 490 U.S. at 397).

Whether use of force is reasonable should be judged by "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the individual is actively resisting or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.  In this case, *all* of those aggravating factors were present.

Officers were at the residence to arrest Cameron on suspicion of first degree murder—a crime for which he faced a mandatory life sentence if convicted.  Furthermore, he has a lengthy criminal history which includes a conviction for violent crime.[3]  Officers believed that Cameron

---

[3] In his resistance, Cameron minimizes his criminal history as "a single conviction for domestic abuse."  [ECF No. 45 at 7].

was armed and dangerous at the time of arrest, in part because a firearm was used in the homicide. He was also located at an address associated with a woman who was the protected party in a no-contact order against him.  And finally, Cameron leapt off the roof of a house in an attempt to flee multiple officers through a residential neighborhood.  This dramatic attempt to evade arrest indicates it was potentially necessary to use a greater level of force.

Accordingly, the Court concludes that the force used to arrest Cameron was not constitutionally excessive.  At a minimum, it was not clearly established that a warning was required by the Fourth Amendment before Bero could be deployed on Cameron under these circumstances.  Furthermore, Cameron has not shown that it was clearly established that Bero's bite lasted such an extended period of time that it offends the United States Constitution. Defendants are entitled to summary judgment on Count I.

## 2.  Count II: Failure to Intervene

Police officers have a constitutional duty to intervene under certain circumstances when another officer is using, or is about to use, excessive force.  *See Mitchell v. Kirchmeier*, 28 F.4th 888, 901 (8th Cir. 2022).  This duty may arise when (1) the officer observed or had reason to know that excessive force was being used or would be used and (2) the officer had the means and opportunity to prevent the unlawful use of force.  *Robinson v. Payton*, 791 F.3d 824, 829 (8th Cir. 2015).  However, it is well-established "there is no duty to prevent the constitutional use of reasonable force."  *McManemy v. Tierney*, 970 F.3d 1034, 1039 (8th Cir. 2020) (emphasis omitted).

Thus, if another officer did not use excessive force, there was no constitutional violation for failing to intervene in the use of that lawful force.  *Hicks v. Norwood*, 640 F.3d 839, 843 (8th Cir. 2011).  Consistent with the Court's conclusion that the force used to apprehend Cameron was

lawful, there is no constitutional violation for failure to intervene on the part of the other officers on the scene.

### 3. Count III: Failure to Train or Supervise

Liability for a constitutional violation may be imposed on a municipality if "the violation resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise." *Corwin v. City of Independence*, 829 F.3d 695, 699 (8th Cir. 2016) (cleaned up). A claim against a municipality for failure to train requires a constitutional violation underlying the alleged failure. *See Schutz v. Long*, 44 F.3d 643, 650 (8th Cir. 1995) ("It is the law in this circuit . . . that a municipality may not be held liable on a failure to train theory unless an underlying Constitutional violation is located."). The Court has already concluded that no constitutional violation has occurred here. Defendants are entitled to summary judgment on Count III.

### 4. Count IV: Policy and Custom

Cameron's claim for *Monell* liability in Count IV, alleging unconstitutional policies and customs, also fails without a constitutional violation. Under *Monell*, "[S]ection 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from . . . an 'official municipal policy.'" *Corwin*, 829 F.3d at 699. "It follows that, absent a constitutional violation by a city employee, there can be no § 1983 or *Monell* liability" for a municipality. *Whitney v. City of St. Louis, Mo.*, 887 F.3d 857, 861 (8th Cir. 2018) (cleaned up). No constitutional violation means no *Monell* liability against the City or Chief Wingert. Summary judgment on Count IV will be granted.

5.   Count V: Negligence

In Count V, Cameron brings a claim of negligence against the officers on the scene due to the manner in which Bero was used to effectuate his arrest.  He specifically alleges that it was negligent to not provide a warning before releasing Bero and by allowing the dog to continue biting him after he had been caught.

Negligence is not presumed under Iowa law.  *Singh v. McDermott*, 2 N.W.3d 422, 425 (Iowa 2024) (citation omitted).  This means that "the occurrence of an injury or accident, 'without more, does not mean the defendant was negligent.'"  *Id*. (quoting *Smith v. Koslow*, 757 N.W.2d 677, 680 (Iowa 2008)).  Under Iowa law, "[a]n actionable negligence claim requires the existence of a duty to conform to a standard of conduct to protect others, a failure to conform to that standard, proximate cause, and damages."  *Thompson v. Kaczinski*, 774 N.W.2d 829, 834 (Iowa 2009) (quoting *Van Essen v. McCormick Enters. Co.*, 599 N.W.2d 716, 718 (Iowa 1999)).  "An actionable negligence claim requires 'the existence of a duty to conform to a standard of conduct to protect others.'"  *Morris v. Legends Fieldhouse Bar & Grill, LLC*, 958 N.W.2d 817, 821 (Iowa 2021) (citation omitted).

Whether a person owes a duty to another is a question of law.  *Huck v. Wyeth, Inc.*, 850 N.W.2d 353, 387 (Iowa 2014); *see also Hoyt v. Gutterz Bowl & Lounge, L.L.C.*, 829 N.W.2d 772, 775 (Iowa 2013) ("While summary adjudication is rarely appropriate in negligence cases, the determination of whether a duty is owed under particular circumstances is a matter of law for the court's determination.").

The Iowa Supreme Court has recognized that the Iowa Municipal Tort Claims Act ("IMTCA") "does not create liability for the acts of officers that involve mere negligence."  *Morris v. Leaf*, 534 N.W.2d 388, 391 (Iowa 1995).  An officer may be held liable if a plaintiff can establish

a special relationship with the officer, which requires a showing: (1) the police created the situation that puts the plaintiff in danger or (2) police took the citizen into custody or control. *Hawkeye Bank & Tr. Co. v. Spencer*, 487 N.W.2d 94, 97 (Iowa Ct. App. 1992).

Cameron can show neither. In fact, it was his conduct that created the situation when he attempted to flee a lawful arrest by leaping from a rooftop. He also was not in custody but instead was in the process of being arrested. *See Chambers v. Pennycock*, 641 F.3d 898, 905 (8th Cir. 2011) (observing that "it is appropriate to use a Fourth Amendment framework to analyze excessive force claims arising out of incidents occurring shortly after arrest").

Moreover, Iowa law expressly permits officers to use force during the course of an arrest provided it is reasonable. Iowa Code § 804.8(1) ("A peace officer, while making a lawful arrest, is justified in the use of any force which the peace officer reasonably believes to be necessary to effect the arrest or to defend any person from bodily harm while making the arrest."). This is the same objective reasonableness standard drawn from *Graham*. *See Chelf v. Civil Serv. Comm'n of City of Davenport*, 515 N.W.2d 353, 355–56 (Iowa Ct. App. 1994) (describing the "inquiry in an excessive force case [as] an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation") (quoting *Graham*, 490 U.S. at 397). The same considerations informing objective reasonableness set forth in *Graham* are used under Iowa Code Section 804.8. *Turk v. Iowa W. Racing Ass'n, Inc.*, 690 N.W.2d 695 (Iowa Ct. App. 2004) ("In deciding whether a particular use of force is objectively reasonable, courts examine the facts and circumstances of each case, including the crime's severity, whether the suspect poses an immediate threat to the safety of officers or others, and whether the suspect actively resists arrest or flees.")

(cleaned up) (citation omitted).    The Court has already concluded that the use of force was reasonable here.  Summary judgment in favor of Defendants is appropriate on Count V.

### 6.  Count VI: Battery

Cameron alleges in Count VI that the force used during his arrest constituted a battery under Iowa law.  However, "a police officer is not liable for assault and battery in connection with a use of force he or she is statutorily authorized to employ."  *Lawyer v. City of Council Bluffs, Iowa*, 240 F. Supp. 2d 941, 955 (S.D. Iowa 2002).  This privilege to commit a battery while making a lawful arrest is subject only to "the limitation on excessive force."  *Id*.  For the same reasons discussed above, Defendants are entitled to summary judgment on the battery claim in Count VI.

### 7.  Count VII: Aiding and Abetting Battery

Cameron alleges that Officer Hays and the other officers present on the scene assisted Officer Meunsaveng and Bero in battering him.  "Under Iowa law, a claim for aiding and abetting another's wrongful act can be maintained if a person knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself."  *PFS Distribution Co. v. Raduechel*, 574 F.3d 580, 595 (8th Cir. 2009) (cleaned up) (citation omitted).   Because Officer Meunsaveng did not use excessive force, there was no battery to aid or abet.  *See Ezzone v. Riccardi*, 525 N.W.2d 388, 398 (Iowa 1994) (requiring "a wrong to the primary party" to establish a claim for aiding and abetting).   Defendants are entitled to summary judgment on Count VII.

### 8.  Count VIII: Statutory Liability for Dog Bite

Count VII asserts a strict liability claim against the City for Bero's bite.  Iowa law provides that a dog's owner is strictly liable for injuries caused by a dog "except when the party damaged is doing an unlawful act, directly contributing to the injury."  Iowa Code § 351.28.

In this case, Defendants argue that unlawful act was Cameron's flight from arrest. Cameron responds that the unlawful act "must be one that directly contributes to the injury sustained; otherwise, it is no defense." [ECF No. 45 at 21] (citing *Beckler v. Merringer*, 109 N.W. 185, 185 (Iowa 1906)).  An unlawful act does not directly contribute to an injury if there is "any intervening space or time: next in order." *Id*. (quoting *The Sherwin-Williams Co. v. Iowa Dep't of Revenue*, 789 N.W.2d 417, 433 (Iowa 2010)).  According to Cameron, the intervening act was when Officer Meunsaveng "commanded K-9 Bero to bite him." *Id*.  He contends that his "brief flight" was not "next in order" due to the command provided to Bero.

This argument is unpersuasive.  Cameron offers no case law to support his interpretation of Section 351.28.  Under his proposed construction, Iowa law would hold law enforcement agencies strictly liability virtually every time a K-9 is used to apprehend a suspect.  The district court in *Adams* rejected a similar claim by the plaintiffs in that case, and the Court will do the same here. *See Adams v. City of Cedar Rapids, Iowa*, No. 21-cv-53-MAR, 2022 WL 16572036, at *11–12 (N.D. Iowa Oct. 19, 2022).

9. Count IX: Negligent Hiring, Training, and Supervision

Count IX of Cameron's Complaint alleges negligent hiring, training, and supervision by the City and Chief Wingert.  The crux of his claim is the Officer Meunsaveng was insufficiently trained regarding his handling of a K-9.  Specifically, this includes the provision of a warning and the department policy stating that a K-9 should be released from a suspect when he "no longer poses a threat, and other officers are present to maintain control." [ECF No. 41-2 ¶ 13].

Iowa law provides that an employer may be held independently liable for a failure to train or supervise its employees. *See Godar v. Edwards*, 588 N.W.2d 701, 708–09 (Iowa 1999) (imposing on an employer "the duty to exercise reasonable care in [supervising or training]

individuals who, because of their employment, may pose a threat of injury to members of the public"). The legal principles underlying tort claims for negligent training and negligent supervision are delineated in the Restatement (Second) of Agency. *Id*. (citing Restatement (Second) of Agency § 213 (Am. L. Inst. 1957)).

These claims require proof of two different types of tortious misconduct. *Struck v. Mercy Health Servs.-Iowa Corp.*, 973 N.W.2d 533, 544 (Iowa 2022) ("[T]he injured party must prove a case within a case.") (citation omitted). A plaintiff must first establish the employer was negligent in training or supervising the employee. *Jorgensen v. Smith*, 2 N.W.3d 868, 877 (Iowa 2024) (citing *Struck*, 973 N.W.2d at 544). Second, negligence or other unlawful misconduct by the employee must be shown. *Id*. In other words, a claim for negligent training or supervision is actionable only if the underlying conduct is actionable against the employee and proper supervision or training would have prevented the conduct. *Schoff v. Combined Ins. Co. of Am.*, 604 N.W.2d 43, 53 (Iowa 1999) (concluding that "an employer cannot be held liable for negligent supervision or training where the conduct that proper supervision and training would have avoided is not actionable against the employee.").

The Court has already determined that no tort or unlawful act occurred during Cameron's arrest. Therefore, he cannot establish a claim for negligent hiring, training, or supervision. Summary judgment on Count IX will be granted.

### 10. Count X: *Respondeat Superior* Liability

Finally, Count X brings a claim for *respondeat superior* liability against the City. This type of vicarious liability is not available under Section 1983, even if the Court has found a constitutional violation. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978).

The IMTCA does provide for liability for a municipality for torts committed by "its officers and employees, acting within the scope of their employment or duties."  Iowa Code § 670.2(1). This requires proving an employer/employee relationship and proving that the plaintiff's injury occurred within the scope of the employee's employment.  *Biddle v. Sartori Mem'l Hosp.*, 518 N.W.2d 795, 797 (Iowa 1994) (citation omitted).  However, an "employer has no liability unless the employee is liable."  *Dickens v. Associated Anesthesiologists, P.C.*, 709 N.W.2d 122, 125 (Iowa 2006) (citing *Peppmeier v. Murphy*, 708 N.W.2d 57, 63–64 (Iowa 2005)).  Once more, no tort was committed by any of the City's employees in this case, so summary judgment on this count is appropriate.

### III.    CONCLUSION

For the reasons discussed above, Defendants' Motion for Summary Judgment is GRANTED.  [ECF No. 29].

IT IS SO ORDERED.

Dated this 25th day of October, 2024.

_____
STEPHANIE M. ROSE, CHIEF JUDGE
UNITED STATES DISTRICT COURT